UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

CASTLERIGG MASTER INVESTMENTS LTD.,    :
:
Plaintiff,    :    Civ. Action No.:  07 CIV 6385 (SAS)
:    ECF Case
v.    :
:    **AMENDED COMPLAINT**
APOLLO RESOURCES INTERNATIONAL, INC.,    :
:
Defendant.    :

------------------------------------------------------------x

Plaintiff Castlerigg Master Investments Ltd. ("Castlerigg"), by its attorneys

Schulte Roth & Zabel LLP, as and for its Amended Complaint against Defendant Apollo

Resources International, Inc. ("Apollo" or the "Company"), hereby alleges on the basis of

knowledge with respect to itself and its actions, and on the basis of information and belief as to

all other matters, as follows:

## NATURE OF THE ACTION

1.    This is an action for specific performance, preliminary and permanent

injunctive relief and damages resulting from Apollo's breach of covenants relating to a Senior

Secured Convertible Note it issued to Castlerigg on December 29, 2006 (the "Note"), including

Apollo's refusal to redeem the Note as it is required to do.  A copy of the Note is attached hereto

as Exhibit A.

2.    In addition to a judgment on the amounts due under the Note, Castlerigg

seeks specific performance of protective covenants contained in the Note and a related

agreement between Apollo and Castlerigg.  In aid of such specific performance, Castlerigg also

seeks an injunction restraining two transactions and any other conduct that would violate the

covenants.  The transactions are as follows:

   a. <u>The Apollo/Imperial Transaction</u>.  This transaction is an asset sale to Imperial Petroleum, Inc. ("Imperial") that Apollo intends to consummate along with two of its subsidiaries, Mountain States Petroleum Company ("MSP") and BC&D Oil and Gas Corporation ("BC&D") whereby Imperial would be assuming certain Apollo debt (the "Apollo/Imperial Transaction").

   b. <u>Apollo's "Going Private" Transaction</u>.  Apollo has proposed to do a "going private" transaction through a reverse/forward stock split.

  3. There is no adequate remedy at law for Apollo's breach of the protective covenants in the Note.  The effect of the above transactions and any other action in violation of the protective covenants would be to irreparably harm Castlerigg by violating those covenants and impairing the ability of Apollo, which already is in severe financial straits, to pay its obligations due and owing under the Note.

  4. Apollo has agreed that there is no adequate remedy at law for its violation of the covenants of the Note and that such would constitute irreparable harm to Castlerigg:

> The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note.  Amounts set forth or provided for herein with respect to payments, conversion and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof).  **The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate.  The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any breach, without the necessity of showing economic loss and without any bond or other security being required.**

2

(Exhibit A at § 18) (emphasis added.)

## THE PARTIES

5.      Plaintiff Castlerigg Master Investments Ltd. is a British Virgin Islands company with its registered office at P.O. Box 71, Criagmuir Chambers, Road Town, Tortola, British Virgin Islands.

6.      Defendant Apollo is a Utah corporation with its principal place of business at 3001 Knox Street, Suite 403, Dallas, Texas 75205.

## JURISDICTION AND VENUE

7.      Jurisdiction in this action is based upon diversity of citizenship of the parties pursuant to 28 U.S.C. § 1332.

8.      The amount in controversy exceeds the sum of seventy-five thousand dollars ($75,000), exclusive of interest and costs.

9.      Venue for this action is proper under 28 U.S.C. § 1391(a)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this District.

10.     The parties have agreed that this dispute may be adjudicated in this Court. The Note that is the subject of this action provides as follows:

> The Company [Apollo] hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper.

(Exhibit A at § 26.)

11.    In addition, Section 8(d) of the Amendment Agreement dated as of

December 29, 2006, which was entered into between Apollo and Castlerigg provides, in part, as

follows:

> Each party hereby irrevocably submits to the exclusive jurisdiction
> of the state and federal courts sitting in The City of New York,
> Borough of Manhattan, for the adjudication of any dispute
> hereunder or in connection herewith or with any transaction
> contemplated hereby or discussed herein, and hereby irrevocably
> waives, and agrees not to assert in any suit, action or proceeding,
> any claim that it is not personally subject to the jurisdiction of any
> such court, that such suit, action or proceeding is brought in an
> inconvenient forum or that the venue of such suit, action or
> proceeding is improper.

A copy of the Amendment Agreement, the contract pursuant to which the Note was issued to

Castlerigg, without its exhibits, is attached hereto as Exhibit B.

## FACTS

### The Transaction Documents

12.    Pursuant to the terms of a Securities Purchase Agreement, dated as of July

25, 2006 (the "Securities Purchase Agreement"), entered into between Apollo and Castlerigg,

among others, Apollo issued to Castlerigg 13,157,895 shares (the "Common Shares") of

common stock of Apollo, $0.001 par value per share (the "Common Stock") and warrants

exercisable into 16,477,369 shares of Common Stock (the "Warrants"). Castlerigg paid Apollo

five million dollars ($5,000,000) to purchase the aforementioned Common Shares and Warrants.

A copy of the Securities Purchase Agreement without exhibits is annexed hereto as Exhibit C.

13.    At the same time that Apollo and Castlerigg entered into the Securities

Purchase Agreement, they also entered into a Registration Rights Agreement, dated as of July

25, 2006 (the "Registration Rights Agreement"), pursuant to which Apollo agreed to provide

certain registration rights with respect to Registrable Securities, as that term is defined in the

4

Registration Rights Agreement.  A copy of the Registration Rights Agreement is annexed hereto as Exhibit D.

14.    Several months later, Apollo and Castlerigg entered into an Amendment Agreement dated as of December 29, 2006, which, among other things, amended the Securities Purchase Agreement and the Registration Rights Agreement. *See* Exhibit B at § 2.  The Amendment Agreement, the Securities Purchase Agreement, the Registration Rights Agreement and the Note, together with the agreements entered into between the parties in connection with the transactions contemplated by the Securities Purchase Agreement and the Amendment Agreement, are collectively referred to as the "Transaction Documents."  (Exhibit B at § 2(c); Exhibit C at § 3(b).)

15.    Under the Amendment Agreement, in exchange for the delivery to Apollo for cancellation of the Common Shares and Warrants previously issued to Castlerigg, Apollo issued the Note to Castlerigg with a principal amount of Eight Million Two Hundred Ninety-Six Thousand Seven Hundred and Fifty-Two Dollars ($8,296,752), which represented the sum of Eight Million Fifty-Two Thousand Six Hundred and Thirty-Two Dollars ($8,052,632) and Two Hundred Forty-Four Thousand One Hundred and Twenty Dollars ($244,120) of projected Registration Delay Payments, as that term is defined in Section 2(f) of the Registration Rights Agreement.

## Events Of Default Under Note Sections 4(a)(ix) and 4(a)(v)

### *Unpaid Installment Amounts and Interest*

16.    The Company has failed to pay Castlerigg the required Installment Amounts and Interest, as those terms are defined in the Note.

5

17.     Section 1 of the Note provides, in part, that "[o]n each Installment Date, the Company shall pay to the Holder [Castlerigg] an amount equal to the Installment Amount due on such Installment Date in accordance with Section 8," which provides that the Company shall pay Castlerigg the Installment Amount due on each applicable Installment Date by redeeming such amount in accordance with the terms of the Note. (Exhibit A at § 1.)

18.     The Note defines "Installment Amount" as follows:

> [T]he lesser of (A) the Principal amount under the Note as of such Installment Date together with the sum of any accrued and unpaid Interest with respect to such Principal amount and accrued and unpaid Late Charges, if any, with respect to such Principal amount and Interest and (B) (i) with respect to the March 31, 2007 Installment Date, $2,750,000, (ii) with respect to the May 30, 2007 Installment Date, the sum of (x) $3,000,000 and (y) the Registration Delay Amount (as defined in the Amendment Agreement) and (z) with respect to the March 31, 2007 Installment Date, $1,000,000, in each case, as any such Installment Amount may be reduced pursuant to the terms of this Note, whether upon conversion, redemption or otherwise, together with, in each case the sum of any accrued and unpaid Interest with respect to such Principal amount and accrued and unpaid Late Charges, if any, with respect to such Principal amount and Interest. In the event the Holder shall sell or otherwise transfer any portion of this Note, the transferee shall be allocated a pro rata portion of the each unpaid Installment Amount hereunder.

(Exhibit A at § 27(t).) The Installment Dates identified in the Note are March 31, 2007, May 30, 2007 and November 30, 2007. (Exhibit A at § 27(u).)

19.     The Company failed to pay Castlerigg the required Installment Amounts on March 31, 2007 and May 30, 2007. Those failures constitute Events of Default under Section 4(a)(xi) of the Note, which states, in part, that any breach or failure to comply with Section 8 of the Note constitutes an Event of Default.

20.     Under Section 2 of the Note, Interest on the Note began accruing on the issuance date of December 29, 2006, and is "computed on the basis of a 360-day year comprised of twelve (12) thirty (30) day months and shall be payable in arrears for each Interest Period on

6

the applicable Installment Date ... (each, an Interest Date)."  In addition, the Note provides that

"[f]rom and after the occurrence and during the continuance of an Event of Default, the Interest

Rate shall be increased to fifteen percent (15%)."  (Exhibit A at § 2.)  However, the Company

failed to pay the required Interest on the applicable Interest Dates.

    21.  Apollo's failure to pay Castlerigg the Interest on the applicable Interest

Dates continued for a period of more than ten (10) Business Days, as that term is defined in the

Note, that, and the failure to pay Castlerigg the Installment Amounts when due, constitute Events

of Default under Section 4(a)(v) of the Note, which provides that the following are Events of

Default:

> the Company's failure to pay to the Holder any amount of Principal, Interest, Late
> Charges or other amounts when and as due under this Note (including, without
> limitation, the Company's failure to pay any redemption payments or amounts
> hereunder) or any other Transaction Document (as defined in the Securities
> Purchase Agreement) or any other agreement, document, certificate or other
> instrument delivered in connection with the transactions contemplated hereby and
> thereby to which the Holder is a party, except, in the case of a failure to pay
> Interest and Late Charges when and as due, in which case only if such failure
> continues for a period of at least ten (10) Business Days[.]

(Exhibit A at § 4(a)(v).)

**Event of Default Under Note Section 4(a)(ii)**

   *Common Stock Not Listed on "Eligible Market"*

    22.  An Event of Default also occurs under the Note when the Company is

suspended from trading or its Common Stock fails "to be listed on an Eligible Market for a

period of five (5) consecutive Trading Days or for more than an aggregate of ten (10) Trading

Days in any 365-day period[.]"  (Exhibit A at § 4(a)(ii).)

    23.  The Note defines "Eligible Market" as "the Principal Market [OTC

Bulletin Board ("OTCBB")], The New York Stock Exchange, Inc., the American Stock

7

Exchange, the NASDAQ Global Select Market, The NASDAQ Global Market or The NASDAQ Capital Market." (Exhibit A at § 27(m).)

24.    According to the Schedule 13E-3 that the Company filed on or about May 18, 2007 with the Securities and Exchange Commission (the "SEC"), "[o]n or about April 23, 2007, the NASD notified the Company that the Company's securities were to be removed from quotation on the OTCBB effective at the open of business on April 27, 2007." The Company now trades as an OTC "Pink Sheet."

25.    Because the Company was removed from the OTCBB on April 27, 2007, and has not been listed on any Eligible Market for more than five (5) consecutive Trading Days, an Event of Default has occurred under Section 4(a)(ii) of the Note.

## Events of Default Under Note Sections 4(a)(i) and 4(a)(v)

### *The Registration Statement Has Not Been Filed Or Deemed Effective*

26.    Section 2(a) of the Registration Rights Agreement, as amended by the Amendment Agreement, provides that the "Company shall prepare, and, as soon as practicable but in no event later than the Filing Deadline, file with the SEC the Registration Statement on Form S-3 covering the resale of all of the Registrable Securities issuable upon then outstanding Securities." (Exhibit D at § 2(a).)

27.    The Filing Deadline for the Company to file the Registration Statement was October 24, 2006, because it was ninety (90) days after the Closing Date of July 26, 2006. (Exhibit D at § 1(e); Exhibit C at § 1(a)(ii).) However, the Company failed to file the Registration Statement by the Filing Deadline.

28.    The Registration Rights Agreement also provides that the "Company shall use its best efforts to have the Registration Statement declared effective by the SEC as soon as practicable, but in no event later than the Effectiveness Deadline." (Exhibit D at § 2(a).)

8

29.    The Effectiveness Deadline is defined in the Registration Rights Agreement as "the date which is (i) in the event that the Registration Statement is not subject to a review by the SEC, 120 calendar days after the Closing Date [November 23, 2006] or (ii) in the event that the Registration Statement is subject to a review by the SEC, 180 calendar days after the Closing Date [January 22, 2007]." See Exhibit D at § 1(d).

30.    Because the Registration Statement was never filed by the Company, the SEC never determined whether it would review the Registration Statement. However, in no event could the Effectiveness Deadline have been later than January 22, 2007.

31.    Pursuant to Section 4(a)(i) of the Note, an Event of Default occurs upon:

> the failure of the applicable Registration Statement required to be filed pursuant to the Registration Rights Agreement to be declared effective by the SEC on or prior to the date that is sixty (60) days after the applicable Effectiveness Deadline (as defined in the Registration Rights Agreement), or, while the applicable Registration Statement is required to be maintained effective pursuant to the terms of the Registration Rights Agreement, the effectiveness of the applicable Registration Statement lapses for any reason (including, without limitation, the issuance of a stop order) or is unavailable to any holder of the Notes for sale of all of such holder's Registrable Securities (as defined in the Registration Rights Agreement) in accordance with the terms of the Registration Rights Agreement, and such lapse or unavailability continues for a period of ten (10) consecutive days (other than days during an Allowable Grace Period (as defined in the Registration Rights Agreement)[)] or for more than an aggregate of thirty (30) days in any 365-day period (other than days during an Allowable Grace Period)[.]

(Exhibit A at § 4(a)(i).)

32.    Sixty (60) days after the latest possible Effectiveness Deadline of January 22, 2007 was March 23, 2007. The required Registration Statement for the Required Registration Amount of shares of Common Stock was not declared effective by the SEC by March 23, 2007. In fact, no Registration Statement has been declared effective by the SEC for such shares of Common Stock as of the date of this Amended Complaint. Accordingly, an Event of Default has occurred and is continuing under Section 4(a)(i) of the Note.

9

33.    In addition, as a result of the foregoing, the Company was required to make "Registration Delay Payments" to Castlerigg under Section 2(f) of the Registration Rights Agreement.  That section requires Registration Delay Payments to be paid if, *inter alia*, the Company misses the Filing Deadline or if the Registration Statement is not declared effective by the SEC by the Effectiveness Deadline.  Pursuant to the foregoing, the Company was required to make Registration Delay Payments to Castlerigg on January 23, 2007, February 22, 2007, March 24, 2007, April 23, 2007 and May 23, 2007.

34.    Notwithstanding its obligation to do so, the Company failed to make the required Registration Delay Payments, which constituted an Event of Default under Section 4(a)(v) of the Note.

## Castlerigg Demands Redemption

35.    Castlerigg has performed all of its obligations under the Note and the Transaction Documents.

36.    The Note provides, among other things, that Castlerigg may require the Company to redeem the Note if there is an Event of Default thereunder: "[u]pon the occurrence of an Event of Default with respect to th[e] Note . . . the Holder may require the Company to redeem all or any portion of th[e] Note[.]"  (Exhibit A at § 4(b).)

37.    On May 11, 2007, Castlerigg sent Apollo an Event of Default Redemption Notice (the "Notice") via facsimile, e-mail and certified mail.  A copy of the Notice is attached hereto as Exhibit E.

38.    The Notice states that "the Company [had] failed to pay both Interest . . . and the Installment Amount . . . due to the Investor on March 31, 2007 . . . , and [because] such failure ha[d] continued for more than ten (10) Trading Days, an Event of Default ha[d] occurred and is continuing pursuant to Section 4(a)(v) of the Note."

39.    In addition, Castlerigg informed Apollo that inasmuch "as the Company was removed from the OTC Bulletin Board on April 27, 2007 and ha[d] not been listed on any Eligible Market ... for more than five (5) consecutive Trading Days, an Event of Default ha[d] occurred and is continuing pursuant to Section 4(a)(ii) of the Note."

40.    Castlerigg also advised the Company that "pursuant to Section 4(a)(i) of the Note, as more than sixty (60) days ha[d] passed since January 22, 2007, the date of the Effectiveness Failure, as of March 23, 2007, an Event of Default ha[d] occurred and is continuing."

41.    The Notice also stated that an Event of Default had occurred under Section 4(a)(v) of the Note because of the Company's failure to timely pay Castlerigg Registration Delay Payments with respect to its having missed the Filing Deadline and because the Registration Statement was not declared effective by the SEC by the Effectiveness Deadline.

42.    Based on the above-described Events of Default, the Notice informed the Company of Castlerigg's election to "exercise its redemption right pursuant to Section 4(b) of the Note . . . [and of its] elect[ion] to redeem the entire Note in full at the Event of Default Redemption Price[.]"  The Notice further informed the Company that, pursuant to Section 11(a) of the Note, it was required to pay Castlerigg the Event of Default Redemption Price within five (5) business days of receipt of the Notice.  (Exhibit A at § 11(a).)

43.    As of the date of filing of this Amended Complaint, the Company has failed to pay Castlerigg the Event of Default Redemption Price.

44.    Furthermore, because the Company has failed to timely pay Castlerigg the Event of Default Redemption Price, the Company also owes late charges to Castlerigg.  Section 23(b) of the Note provides:

11

> Any amount of Principal or other amounts due under the Transaction Documents, other than Interest, which is not paid when due shall result in a late charge being incurred and payable by the Company in an amount equal to interest on such amount at the rate of eighteen percent (18%) per annum from the date such amount was due until the same is paid in full ("Late Charge").

(Exhibit A at § 23(b).)

45.    In addition to the amounts Apollo owes to Castlerigg set forth above, Apollo is also liable for Castlerigg's costs, attorneys' fees and disbursements incurred in connection with this action to enforce the provisions of the Note.  Section 19 of the Note provides that:

> If (a) this Note is placed in the hands of an attorney for ... enforcement or is ... enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note ..., then the Company shall pay the costs incurred by the Holder for such ... enforcement or action ..., including, but not limited to, attorneys' fees and disbursements.

(Exhibit A at § 19.)

**Apollo's Precarious Financial Condition**

46.    In addition to failing to pay Castlerigg the Installment Amounts and Interest due under the Note, Apollo has not filed financial and operating reports with the SEC since its Form 10-Q for the quarter ended September 30, 2006.  To date, Apollo has not filed its Form 10-K for the year ending December 31, 2006, or its Form 10-Q for the quarter ending March 31, 2007.

47.    The reason Apollo has given for needing more time to file its overdue financial statements is because its new CFO would need "a reasonable opportunity to review the Company's financial condition."  (*See* Apollo's Form 8-K dated May 4, 2007.)

48.    Apollo has a new CFO is because its former CFO resigned over concerns about the Company's corporate governance and internal controls. The former CFO's resignation letter stated, in part, as follows:

> I am perhaps most troubled by my ability to move Apollo in a direction toward better internal controls, fiscal responsibility and basic corporate governance. ... During my tenure at Apollo I have tried to impress upon management and the Board the need for sound corporate governance and internal controls, I have come to the conclusion that my efforts are futile. The lack of ability of Apollo's directors and officers to improve and solidify Apollo's internal controls is particularly troubling.

(*See* Exhibit 10.1 to Apollo's Form 8-K dated May 4, 2007.)

49.    Apollo has conceded that it does "not have the financial wherewithal to manage the implementation of Sarbanes-Oxley." (*See* Apollo's Schedule 14C filed with the SEC on May 29, 2007 at 11.)

50.    Apollo's subsidiary, Earth Biofuels, Inc. ("EBOF"), is presently the subject of an involuntary bankruptcy case in Delaware Bankruptcy Court. Five creditors, including Castlerigg, have asserted that EBOF has failed to generally pay its debts as they become due.

**The Apollo/Imperial Transaction**

51.    According to a Form 8-K filed by Apollo with the SEC on June 26, 2007, the Company along with two of its subsidiaries (MSP and BC&D) have agreed to sell certain assets to Imperial. A copy of the Imperial Purchase and Sale Agreement is attached hereto as Exhibit F. The Apollo/Imperial Transaction was scheduled to close on August 1, 2007, but on July 31, 2007, this Court entered a Temporary Restraining Order preventing the closing pending a preliminary injunction hearing set for August 15, 2007.

52.    As part of the purchase price, Imperial is to provide three forms of consideration: (a) cash payment to Apollo in the amount of $2.5 million (subject to adjustment); (b) payment or discharge of certain of Apollo's debts in the aggregate of up to $8.3 million, as set

forth on Exhibit B to the Imperial Purchase and Sale Agreement; and (c) five million shares of the restricted common stock of Imperial subject to a registration rights agreement.

(*See* Exhibit F at 4.)

53.    Apollo's debt to be paid off by Imperial is set forth on Exhibit B to the Imperial Purchase and Sale Agreement as follows (collectively and individually referred to as "Apollo Debt"):

- Accounts payable and revenue payable directly associated with the assets, but not to exceed $3 million;

- Notes payable to banks and secured by the properties not to exceed $0.8 million;

- Pipeline right-of-way payments to the Navajo Indian nation in the amount of $1.0 million affecting the Boundary Butte field;

- Plugging bond due the State of New Mexico in the amount of $0.7 million and assumption of plugging liability in the Hospah field in an estimated amount of $2.8 million; and

- Plugging liability for the damaged SWD well in the DBK field.

(*See* Exhibit F at Exhibit B.)

54.    Obviously, the consideration that Imperial is paying for the assets subject to the Apollo/Imperial Transaction is commensurately less because Imperial also is assuming obligations of a substantial amount -- up to $8.3 million -- of Apollo Debt.  That reduction effectively constitutes a payment by Apollo with respect to those debts.

55.    As described below, the existence and payment of Apollo Debt violates the covenants in the Note.

Restricted Debt Covenant

56.    The Note identifies Apollo's disclosed and permitted debt while the Note is outstanding -- defined as "Permitted Indebtedness."

57.    Apollo agreed that "[s]o long as th[e] Note is outstanding, the Company shall not, and the Company shall not permit any of its Subsidiaries to, directly or indirectly, incur or guarantee, assume or suffer to exist any Indebtedness,[1] other than (i) the Indebtedness evidenced by this Note and the Other Notes and (ii) other Permitted Indebtedness." (Exhibit A at § (13)(b)). Section 13(b) is hereinafter referred to as the "Restricted Debt Covenant."

58.    Liabilities included within Apollo Debt were not included in the Note's definition of "Permitted Indebtedness." "Permitted Indebtedness" is defined in the Note as Senior Indebtedness (which is "the principal amount of approximately $416,600 outstanding under the 8% Secured Convertible Promissory Notes of the Company issued in accordance with that certain Note and Warrant Purchase Agreement dated June 30, 2005 with certain investors, in each case, as in effect as of [December 29, 2006]") and the Indebtedness evidenced by the Note and the Other Notes. (Exhibit A at § 27(z).)

59.    Therefore, Apollo Debt was either (i) not disclosed by Apollo to Castlerigg to the extent such debt existed at the time the Note was issued on December 29, 2006; or (ii) incurred by Apollo or its subsidiaries after the Note was issued in violation of the Note.

---

[1]    Under the Note, "'Indebtedness' of any Person means, without duplication (i) all indebtedness for borrowed money, (ii) all obligations issued, undertaken or assumed as the deferred purchase price of property or services, including (without limitation) "capital leases" in accordance with GAAP (other than trade payables entered into in the ordinary course of business), (iii) all reimbursement or payment obligations with respect to letters of credit, surety bonds and other similar instruments, (iv) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of property, assets or businesses, (v) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to any property or assets acquired with the proceeds of such indebtedness (even though the rights and remedies of the seller or bank under such agreement in the event of default are limited to repossession or sale of such property), (vi) all monetary obligations under any leasing or similar arrangement which, in connection with GAAP, consistently applied for the periods covered thereby, is classified as a capital lease, (vii) all indebtedness referred to in clauses (i) through (vi) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any mortgage, lien, pledge, charge, security interest or other encumbrance upon or in any property or assets (including accounts and contract rights) owned by any Person, even though the Person which owns such assets or property has not assumed or become liable for the payment of such indebtedness, and (viii) all Contingent Obligations in respect of indebtedness or obligations of others of the kinds referred to in clauses (i) through (vii) above." (Exhibit A at § 27(s).)

Accordingly, the very existence of "Apollo Debt," as detailed in Paragraph 53 above, violates the Restricted Debt Covenant in the Note.

60.    Under Section 4(a)(xi), "any breach or failure in any respect to comply" with Section 13 constitutes an Event of Default. (Exhibit A at § 4(a)(xi).) As such, Apollo's breach of the Restricted Debt Covenant constitutes an Event of Default under the Note.

### Restricted Payments Covenant

61.    In addition, after an Event of Default has occurred and is continuing, the Note has a restriction on the payment of debts. (Exhibit A at § 13(d).) This "Restricted Payments Covenant" provides:

> The Company shall not, and the Company shall not permit any of its Subsidiaries to, directly or indirectly, redeem, defease, repurchase, repay or make any payments in respect of, by the payment of cash or cash equivalents (in whole or in part, whether by way of open market purchases, tender offers, private transactions or otherwise), all or any portion of any Permitted Indebtedness, whether by way of payment in respect of principal of (or premium, if any) or interest on, such Indebtedness if at the time such payment is due or is otherwise made or, after giving effect to such payment, (i) an event constituting an Event of Default has occurred and is continuing or (ii) an event that with the passage of time and without being cured would constitute an Event of Default has occurred and is continuing.

62.    Therefore, even if Apollo Debt were "Permitted Indebtedness," which it is not, it could not be paid once an Event of Default has occurred and is continuing under the Note. Inasmuch as "Permitted Indebtedness" cannot be paid under these circumstances, *i.e.*, where an Event of Default has occurred and continues, obviously, impermissible indebtedness cannot be paid either.

63.    Yet, this is precisely what Apollo is threatening to do by providing Imperial with the consideration to assume Apollo Debt. In light of the indisputable Events of Default that have occurred to date and which continue, as detailed herein, payment of Apollo Debt directly violates the Restricted Payments Covenant.

16

64.    The payoff of Apollo Debt also itself would be an Event of Default under Section 4(a)(xi) of the Note, which provides that "any breach or failure in any respect to comply" with Section 13 constitutes an Event of Default.  (Exhibit A at § 4(a)(xi).)

**Apollo's "Going Private" Transaction**

65.    Apollo has proposed to take itself private with a "Reverse/Forward Stock Split."  On May 18, 2007, Apollo filed a Schedule 13e-3 and a preliminary Information Statement on Schedule 14C with the SEC in order to do the Reverse Forward/Stock Split.  On May 29, 2007, Apollo filed a definitive Information Statement on Schedule 14C ("Schedule 14C").

66.    In a Form 8-K filed with the SEC on June 20, 2007, the Company indicated that it "inten[ded]" to file amended Schedules 13e-3 and 14C on June 18, 2007, and that, as a result, "the effective date [of its "going private" transaction would] now be postponed until the … [SEC] completes its standard review of the filings."

67.    At a July 31, 2007 hearing before this Court, Apollo represented through its counsel that "although a [Definitive Information] statement was filed with the SEC, the SEC came back with comments requiring Apollo to come current with its SEC filings.  It will take [Apollo] some time in order to do that.  Only once …. [Apollo has] done that will the SEC come back and render further comment.  [Apollo is] … not authorized to, in essence, go private at this point."  However, Apollo has not indicated in any way that it has abandoned its intention to go private.

68.    Pursuant to section 13(e) of the Note (the "Non-Redemption Covenant"), a breach of which is another Event of Default, Apollo agreed not to "directly or indirectly, redeem, repurchase or declare or pay any cash dividend or distribution on its capital stock without the

17

prior express written consent of the Required Holders." (Exhibit A at § 13(e).) Required

Holders are defined in the Note as the noteholders "representing at least a majority of the

aggregate principal amount of the Notes then outstanding." (Exhibit A at § 27(ff).) Castlerigg is

the only Required Holder.

69.    Accordingly, by pursuing a Reverse/Forward Stock Split, Apollo will be

redeeming stock without Castlerigg's requisite prior express written consent in violation of the

Note's Non-Redemption Covenant. (Exhibit A at § 13(e).)

70.    Apollo has estimated that the redemption contemplated by the

Reverse/Forward Stock Split will cost in excess of $2.1 million. In addition, Apollo has

disclosed that it anticipates incurring additional advisory, legal, financial, accounting, printing

and other fees in connection with going private. In its preliminary Schedule 14C, Apollo gave

estimates for those fees ranging from $150,000 to $500,000. The $2.1 million plus the fees

represent monies that will be unavailable to Apollo to repay the Note.

71.    In addition, pursuant to Section 9 of the Note (the "Noncircumvention

Covenant"), Apollo agreed that:

> The Company hereby covenants and agrees that the Company will not, by
> amendment of its Certificate of Incorporation, Bylaws or through any
> reorganization, transfer of assets, consolidation, merger, scheme of arrangement,
> dissolution, issue or sale of securities, or any other voluntary action, avoid or seek
> to avoid the observance or performance of any of the terms of this Note, and will
> at all times in good faith carry out all of the provisions of this Note and take all
> action as may be required to protect the rights of the Holder of this Note.

(Exhibit A at § 9.) Yet Apollo has disclosed that its Board of Directors intends to consummate

the Reverse/Forward Stock Split through an amendment to Apollo's Restated Articles of

Incorporation.[2] Accordingly, Apollo's intended filing of amended Restated Articles of

---

[2]    Apollo refers to its Certificate of Incorporation as "Restated Articles of Incorporation" in its Schedule 14C.

18

Incorporation is a threatened breach of the Noncircumvention Covenant of the Note. (Exhibit A at § 9.)

72.    "Going private" also will result in a breach of Apollo's obligations under Section 4(f) of the Securities Purchase Agreement (the "Listing Covenant"), which provides that "[n]either the Company nor any of its Subsidiaries shall take any action which would be reasonably expected to result in the delisting or suspension of the Common Stock." (Exhibit C at § 4(f).) By going private, Apollo will no longer be a public company and will be incapable of being listed on any public exchange.

73.    In addition, the going private transaction and the Apollo/Imperial Transaction will be Events of Default under Section 4(a)(x) of the Note, which occur upon the Company's breach of any representation, warranty, covenant or other term or condition of any Transaction Document, e.g., the Note, "which breach has ... a cost or adverse impact on the Company ... in excess of $250,000." (Exhibit A at § 4(a)(x).)

## FIRST CLAIM FOR RELIEF

(Breach of Contract - Apollo's Failure to Redeem the Note)

74.    Castlerigg repeats and realleges each and every allegation set forth in paragraphs 1 through 73 above as though fully set forth herein.

75.    As described above, Apollo has breached its covenants under the Transaction Documents and Events of Default have occurred.

76.    Based on the aforesaid Events of Defaults, Castlerigg has demanded that the Company redeem the Note. Despite its clear contractual obligations, Apollo has failed to do so.

77.    In addition, Apollo has failed to make Registration Delay Payments to Castlerigg, as required under the Transaction Documents.

19

78.    As a result, Castlerigg has been damaged in an amount to be determined at

trial, but which is not less than $9,751,880, which is comprised of the Event of Default

Redemption Price, as defined in Section 4(b) of the Note, the accrued and unpaid Installment

Amounts, Interest, Registration Delay Payments and Late Charges (in each case calculated as of

the date of filing of this Amended Complaint), plus interest accruing thereon.

### SECOND CLAIM FOR RELIEF

(Breach of Contract and Anticipatory Breach of Contract -
Violation and Threatened Violation of Restricted Covenants
in Connection with the Apollo/Imperial Transaction)

79.    Castlerigg repeats and realleges each and every allegation set forth in

paragraphs 1 through 78 above as though fully set forth herein.

80.    Apollo breached the Restricted Debt Covenant in the Note by failing to

schedule the up to $8.3 million in debt that is part of the consideration to be assumed by Imperial

in connection with the Apollo/Imperial Transaction.

81.    Apollo threatens to breach the Restricted Payments Covenant in the Note

by having Imperial assume up to $8.3 million in debt as part of the consideration for the

Apollo/Imperial Transaction.

82.    Money damages are an insufficient substitute for performance.

Accordingly, Castlerigg is entitled to specific performance requiring the Company to abide by

the Restricted Debt and Restricted Payments Covenants in the Note.  An injunction of the

Apollo/Imperial Transaction also is appropriate because Castlerigg otherwise will be irreparably

harmed as a result.

20

## THIRD CLAIM FOR RELIEF

(Anticipatory Breach of Contract - Apollo's Threatened Violation of Covenants
In Connection with "Going Private" Transaction)

83.    Castlerigg repeats and realleges each and every allegation set forth in

paragraphs 1 through 82 above as though fully set forth herein.

84.    As explained above, if Apollo consummates its "going private"

transaction, Apollo will breach the Non-Redemption and Noncircumvention Covenants in the

Note.  In addition, Apollo also will breach the Listing Covenant in the Securities Purchase

Agreement.

85.    Money damages are an insufficient substitute for performance.

Accordingly, Castlerigg is entitled to specific performance requiring the Company to abide by

the Non-Redemption and Noncircumvention Covenants in the Note and the Listing Covenant in

the Securities Purchase Agreement.  An injunction of the going private transaction also is

appropriate because Castlerigg otherwise will be irreparably harmed as a result.

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

A.    Money damages for amounts due and owing under the Note of not less
than $9,751,880 plus interest accruing thereon;

B.    Specific performance of the Restrictive Debt and Restrictive Payments
Covenants in the Note and preliminary and permanent injunctive relief preventing
Apollo from:  (1) consummating or permitting its subsidiaries to consummate the
Apollo/Imperial Transaction; (2) otherwise redeeming, defeasing, repurchasing,
repaying or making payments in respect of any existing Indebtedness as defined
in Section 27(s) of the Note; and (3) incurring, guaranteeing, or assuming any
new Indebtedness as defined in Section 27(s) of the Note;

C.    Specific performance of the Non-Redemption and Noncircumvention
Covenants in the Note and the Listing Covenant in the Securities Purchase
Agreement and permanent injunctive relief preventing Apollo from (1)
proceeding with a going private transaction through a Reverse/Forward Stock
Split; and (2) otherwise redeeming, repurchasing or declaring or paying any cash
dividend or distribution on Apollo's stock;

21

D.     Costs, reasonable attorneys' fees and disbursements incurred in enforcing its rights in bringing this action; and

E.     Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
      August 6, 2007

SCHULTE ROTH & ZABEL LLP

By: _____
      Alan R. Glickman
      Jeffrey S. Sabin
      Dana M. Roth
      919 Third Avenue
      New York, New York  10022
      (212) 756-2000
      *Attorneys for Castlerigg Master Investments Ltd.*