UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
:
CASTLERIGG MASTER INVESTMENTS LTD.  :    07 CIV 6385 (SAS)
:
              Plaintiff,   :
:
    -against-   :    **<u>AFFIDAVIT IN OPPOSITION</u>**
:
APOLLO RESOURCES INTERNATIONAL, INC. :
:
              Defendant.   :
-------------------------------------------------------------X

COUNTY OF DALLAS    }
                              } ss.:
STATE OF TEXAS      }

      Dennis McLaughlin, being duly sworn, deposes and says:

      1.      I am the CEO and Chairman of the Board of Apollo Resources International, Inc. ("Apollo") – the Defendant in the above-captioned action. I am in charge of operations for Apollo and its subsidiaries. I have served as CEO and Chairman of the Board for Apollo since November 12, 2004. I am submitting this affidavit in opposition to Plaintiff Castlerigg Master Investments Ltd.'s ("Castlerigg") motion for a preliminary injunction. The Court should deny Castlerigg's motion for a preliminary injunction because, as set forth in the accompanying letter brief, the Court does not have the authority to issue the requested pre-judgment restraint on Apollo's assets. Moreover, while a defendant's insolvency or threatened insolvency does not create irreparable harm, Apollo is neither insolvent, nor at risk of becoming insolvent – even if it is permitted to proceed with the sale of its subsidiary's assets to Imperial Petroleum Company ("Imperial") – and Castlerigg cannot articulate any basis upon which completion of the Imperial deal will cause it to suffer irreparable harm.

2.      The Court should further deny Castlerigg's motion, because the very "repayment" covenant contained in the note upon which it seeks its preliminary injunction permits Apollo and its subsidiary's sale of their assets. Additionally, the prohibition contained in the "repayment" covenant against Apollo paying Castlerigg in the event that Apollo is in default supports Apollo's meritorious defenses to Castlerigg's underlying claims. Moreover, the terms of the "repayment" covenant preclude a finding that Castlerigg has a likelihood of success on its newly "spun" specific performance claim. In the end, entry of a preliminary injunction would prevent Apollo from capitalizing on the value of its subsidiary's wasting assets through a sale to Imperial, and render Apollo's subsidiary's assets worthless.

3.      Apollo is the parent company of Mountain States Petroleum Company ("Mountain States") and BC&D Oil and Gas Corporation ("BC&D"). In addition to Mountain States and BC&D, Apollo has many other subsidiaries and investments, including Apollo Alternative Fuels and Earth Biofuels, Inc. The principal assets of Mountain States are oil and gas leases with the Navajo Indian tribe on Navajo Indian land in Arizona and Utah. Similarly, the principal assets of BC&D are oil and gas leases with the Navajo Indian tribe on Navajo Indian land in New Mexico. These leases give Mountain States and BC&D the right to pump and process oil and gas from the wells upon which they have leases.

### *The Increasing Cost of Revenue, Bonding and Physical Plant Liabilities*

4.      As indicated on Mountain State's May 2007 balance sheet and income statement (a copy of which is attached hereto at Exhibit A), its oil and gas leases are valued at approximately $6 million. (BC&D's June 2007 balance sheet and income statement (see Exhibit

B attached hereto) does not specifically set forth the value of its oil and gas leases).[1] As indicated on Mountain States and BC&D's year ended 2006 financial statement attached hereto at Exhibit C, the companies together generated approximately $4.5 million in revenue in 2006.

5.   However, for many of the reasons set forth below, including Mountain States and BC&D's financial inability to maintain and repair their physical plants and operations, they have had to cease their operation of certain wells – thereby reducing their revenues relative to their cost of production. Indeed, while Mountain States and BC&D generated approximately $4.5 million in revenue in 2006, their combined cost of sales was approximately $11 million. As a result of Mountain States and BC&D's growing losses, they cannot meet their liabilities -- which are thereby causing their assets to suffer a downward spiral.

6.   For example, Mountain States and BC&D have significant bonding, "plugging" and maintenance and repair liabilities. BC&D is required to provide the State of New Mexico with a $525,000 bond to plug certain wells when and if BC&D ever abandons them. Pursuant to the terms of the relevant lease, the Bureau of Land Management (under the Department of Interior) has threatened that if BC&D does not provide such a bond by August 16, 2007, it will exercise its power to terminate BC&D's rights to many of its leases.

7.   Attached hereto as Exhibit D is a sample lease held by Mountain States for Arizona. Paragraphs 3(c) and 5 of the lease specifically state that the lessee has rental and royalty payment, as well as bonding obligations. The lease further states that, when in the opinion of the Secretary of the Interior and the Tribal Council, there has been a violation of the terms and conditions of the lease, the Secretary has the right at any time after 30 days notice and hearing, if so requested, to terminate the lease. Although the leases subject to the bonding

---

[1] These are the most recent balance sheets and income statements available for Mountain States and BC&D, respectively.

3

requirement are valuable, BC&D cannot pump from them until it satisfies the bond requirement – which it cannot afford to do at this time.

8.  In addition to its bonding requirement, BC&D has a $2.12 million liability (which it can't satisfy) to plug its wells in the Hospah field in the State of New Mexico. Further, the wells in Mountain States' Arizona's "DBK" field experienced seismic activity which allegedly compromised one of Mountain States' salt-water disposal wells. Mountain States is now required to "cap" and "plug" this well. It is estimated that this will cost approximately $1 million. Beyond simply the cost of "capping" and "plugging" this well, the United States Environmental Protection Agency has issued fines in the amount of $175,000, plus $32,000 per day (since July 16, 2007) until Mountain States "caps" and "plugs" the well.

### *Mountain States and BC&D's Growing "Right of Way" and Royalty Liabilities*

9.  In order to process the oil and gas they have pumped from the wells upon which they have leases, Mountain States and BC&D transport the oil and gas by pipeline across Navajo Indian land. In return for using the Navajo Indian land, Mountain States and BC&D have in the past paid to the Navajo Indians a "right of way" fee for the use of their land. Such payments were made pursuant to a twenty (20) year written agreement. However, the relevant written agreement expired about 2 ½ years ago. While the parties have attempted to negotiate a new agreement, they have not yet been successful in doing so. As a result, for the past 2 ½ years Mountain States and BC&D have been using the Navajo Indian's "right of way" without making any payments for such right, and have incurred a liability to the Navajo Indians in the amount of approximately $1 – $2.5 million.

10. In addition to their unpaid "right of way" obligations, Mountain States and BC&D are obligated to pay the Navajo Indians a royalty and tax on all of the oil and gas they pump from

the wells on Navajo Indian land upon which they have leases. However, Mountain States and BC&D are about three (3) months delinquent in making any such payments. This is a violation of the subject leases. As such, the Navajo Indians have demanded that Mountain States and BC&D cure these liabilities; otherwise, they will initiate termination of Mountain States and BC&D's leases.

11.     All of Mountain States and BC&D's liabilities (specifically including the potential termination of their leases) seriously compromise or threaten to compromise their ability to perform their business. In many instances, Mountain States and BC&D have been forced to cease their operation of certain wells, because they have failed to meet certain obligations. But in all respects, Mountain States and BC&D's inability to meet their obligations has caused the value of their assets to erode. Without immediate action, there is a threat that their assets will soon waste away to a point at which they no longer have any value.

*Mountain States and BC&D Attempt to Maximize the Value of their Assets*

12.     Given the threat that Mountain States and BC&D's revenue producing assets will continue to perish (and/or be terminated), and its current financial inability to address its liabilities, Mountain States and BC&D have attempted to maximize the value of their assets through an immediate sale (subject to the liabilities which attach to the assets). In so doing, Apollo (as a shareholder), along with Mountain States and BC&D have entered into a purchase and sale agreement with Imperial, dated June 19, 2007 (the "Imperial Agreement") – a copy of which is attached to Castlerigg's Amended Complaint as Exhibit F.

13.     The Imperial Agreement contemplates Mountain States and BC&D selling, and Imperial purchasing Mountain States and BC&D's interests in approximately 33 leases to oil and gas wells – set forth on Exhibit A to the Imperial Agreement. Imperial is to purchase the leases

subject to Mountain States and BC&D's liabilities that attach to the lease – as set forth at Exhibit B to the Agreement. As consideration, Imperial will pay $2.5 million in cash, and transfer five (5) million shares of Imperial stock.

14. Imperial is purchasing the leases subject to the following liabilities that "run with" the assets: (a) accounts payable "directly associated with the assets, but not to exceed $3 million; (b) a bank note secured by collateral not to exceed $800,000; (c) pipeline right of way payments to the Navajo Indian nation in the amount of $1 - $2.5 million; (d) a plugging bond due to the State of New Mexico in the amount of $525,000 and a plugging liability in the Hospah field in an estimated amount of $2.12 million; and (e) a plugging liability for the damaged salt water disposal well in the "DBK" field in the amount of $500,000 - $1 million.

15. The Imperial Agreement does not contemplate Apollo transferring any of its assets or its liabilities. Instead, only Mountain States and BC&D will transfer their assets -- subject to their liabilities. <u>Neither Apollo, Mountain States, nor BC&D will "repay" any debt as part of the Imperial transaction</u>. If consummated, the Imperial Agreement, will leave Mountain States with its sole asset as helium reserves, and would leave BC&D without any assets. Accordingly, Apollo plans to close BC&D – in the event that the Imperial transaction closes.

16. Apollo, Mountain States and BC&D have exercised their respective and collective "business judgment" in determining that, under the circumstances, their best course of action is to attempt to maximize the value of Mountain States and BC&D's perishable assets by selling them before they waste away any further. Mountain States and BC&D will be irreparably harmed if the Court interferes with their business judgment by attempting to stop the sale of their assets. Mountain States and BC&D simply don't have the cash necessary to satisfy their obligations and thereby stop their assets from declining in value, and further end the threat that

their leases will be terminated. Accordingly, a sale is their best shot at maximizing the value of their assets.

17. Moreover, Imperial has in the past walked away from deals with Apollo when Apollo was unable to close by the scheduled deadline. Here, while the parties have entered into an Amendment to the Imperial Agreement (a copy of which is attached as Exhibit E) – Imperial only extended Apollo's time to satisfy the requirements to close on the deal to August 10, 2007. If the Court grants Castlerigg's motion for a preliminary injunction, Imperial will walk-away from its deal at a time when Mountain States and BC&D's assets are not only declining in value – but also, are subject to termination. Even if Apollo could find another purchaser (which it has no reasonable prospect of doing), Castlerigg would presumably have the very same objection to a sale to any other purchaser as it does to the sale to Imperial.

*The Imperial Sale Does Not Violate the Terms of the Note*

18. Castlerigg contends that if the parties are permitted to complete the Imperial deal, the sale would violate Paragraph 13(d) of the December 29, 2006 promissory note Apollo provided to Castlerigg. Paragraph 13(d) prohibits Apollo and its subsidiary's repayment of certain "debt," in the event that Apollo defaults under its note. It states:

> 13(d) Restricted Payments. The Company shall not, and the Company shall not permit any of its Subsidiaries to, directly or indirectly, redeem, defease, repurchase, repay or make any payments in respect of, by the payment of cash or cash equivalents . . ., all or any portion of any Permitted Indebtedness if at the time such payment is due or is otherwise made or, after giving effect to such payment, (i) an event constituting an Event of Default has occurred and is continuing or (ii) an event that with the passage of time and without being cured would constitute an event of Default has occurred and is continuing.

However, Paragraph 13(d) does not restrict Mountain States or BC&D's sale of assets and, therefore, Mountain States and BC&D can proceed with the Imperial transaction without violating the terms of the note.

7

19. The sale of Mountain States and BC&D's assets does not constitute the "payment" of any debt. Instead, Imperial's purchase price is simply being adjusted to reflect the obligations directly related to and inseparable from the assets Mountain States and BC&D are selling. The total sale price and consideration to be paid by Imperial reflects the value of assets, net of the liabilities encumbering those assets that Mountain States and BC&D are selling to Imperial. Imperial is under no obligation to, and has made no agreement to repay the obligations running with the assets it is purchasing. There is absolutely nothing in the note which prohibits Mountain States and BC&D's sale of assets. As Castlerigg is a sophisticated investor, had it intended to create such a limitation upon Mountain States and BC&D in the event of a default, it could have included such a restriction in the note, but it failed to do so.

20. But even if the Court were to construe Paragraph 13(d) as prohibiting not just the repayment of debts, but also the assumption of liabilities -- the note merely prohibits the payment of "Permitted Indebtedness." The note defines "Permitted Indebtedness" at Par. 27(z) as "(i) the Senior Indebtedness and (ii) the Indebtedness evidenced by this Note and the other Notes." "Senior Indebtedness" is defined at Par. 27(ii) of the note as "that certain securities purchase agreement dated as of July 25, 2006, by and among the Company and the initial holders of the Notes, as amended by the Amended Agreement."

21. Paragraph 13(d) does nothing more than prohibit Apollo and its subsidiaries from paying a senior note holder, or Castlerigg – in the event that it is in default. It does not preclude Apollo or its subsidiaries from paying any other debt, or from assigning its debt to another. As a matter of law, the very provision upon which Castlerigg relies in support of its motion actually prohibits Apollo from paying to Castlerigg any amounts owing under the note and, therefore,

provides a meritorious defense to not only Apollo's alleged default under the note, but also its purported threatened breach of the "repayment" covenant.

22. Nevertheless, even if Par. 13(d) were read to prohibit not just the repayment of "Permitted Indebtedness," but also "Indebtedness" on the basis that Par. 13(b) of the note prohibits Apollo and its subsidiaries from incurring "Indebtedness" unless it is "Permitted Indebtedness," completion of the Imperial deal would not violate the terms of the note, and further would not cause Castlerigg to suffer any irreparable harm. "Indebtedness" is defined as:

> 27(s) "Indebtedness" of any Person means, without duplication (i) all indebtedness for borrowed money, (ii) all obligations issued, undertaken or assumed as the deferred purchase price of property or services, including (without limitation) "capital leases" in accordance with GAAP (other than trade payables entered into the ordinary course of business), (iii) all reimbursement or payment obligations with respect to letters of credit, surety bonds and other similar instruments, (iv) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of property, assets or businesses, (v) all indebtedness created· or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to any property or assets acquired with the proceeds of such indebtedness (even though the rights and remedies of the seller or bank under such, agreement in the event of default are limited to repossession or ·sale of such property), (vi) all monetary obligations under any leasing or similar arrangement which, in connection with GAAP, consistently applied for the periods covered ,thereby, is classified as a capital lease, (vii) all indebtedness referred to in clauses (i) through (vi) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any mortgage, lien, pledge, charge; security interest or other encumbrance upon or in property or assets (including accounts and contract rights) owned by any Person, even though the Person which owns such assets or property has not assumed or become liable for the payment of such indebtedness, and· (viii) al1 Contingent Obligations in respect of indebtedness or obligations of others of the kinds referred to in clauses (i) through (vii) above.

"Indebtedness" generally refers to contractually incurred liabilities. Of the obligations to be assumed by Imperial, the only two categories that could possibly qualify as "Indebtedness" are the $800,000 collateralized bank note, and the obligations that Mountain States and BC&D incur in connection with their leases.

23. As to the $800,000 secured note, as indicated in Exhibit F attached hereto, BC&D issued this note to West Texas National Bank on January 31, 2006 (which was modified effective May 11, 2006) -- before Apollo's issuance of the instant note to Castlerigg. As the prohibition against Apollo and its subsidiaries incurring any "Indebtedness" that is not "Permitted Indebtedness," did not ante date the note, BC&D was not prohibited from incurring such pre-Castlerigg debt. Moreover, a plain reading of the note does not prohibit the repayment of this lawfully incurred debt. But in any event, the repayment of that note prior to the repayment of the Castlerigg note could not possibly cause Castlerigg to suffer any harm. The $800,000 note is collateralized by a certificate of deposit. Thus, regardless of whether that note is given payment priority over Castlerigg's note, Castlerigg's note will always be subject to the $800,000 bank note, the bank's security interest in the subject collateralized property, and the bank's right of foreclosure. Giving the bank note priority of payment does not in any way harm or injure Castlerigg or threaten it with the loss of any rights.

24. As for the note's alleged prohibition against Mountain States and BC&D incurring any obligations appurtenant to their leases – this is simply absurd. The note cannot mean what it purports to say: that Mountain States and BC&D – whose businesses are based upon their utilization of leases, cannot incur any obligations in connection therewith. This would mean that it would be a violation of the note for Mountain States or BC&D to become obligated to perform certain service and repair work, or to become obligated to pay certain taxes and royalties arising out of the leases. To give effect to this term, Mountain States and BC&D would be required to shut-down their businesses – which would obviously make it impossible for them to generate revenue to repay the note which is the subject of this litigation. Clearly, this is not what the parties intended.

### *The Imperial Sale Will Not Render Apollo Insolvent*

25.     Issuance of a preliminary injunction against Apollo, Mountain States and BC&D, restricting their sale of Mountain States and BC&D's assets to Imperial will undoubtedly cause Mountain States and BC&D to suffer irreparable harm. However, allowing the parties to close on the Imperial deal will not cause Apollo to become insolvent, or impact the collectability of a judgment that Castlerigg may obtain against Apollo in this action. (Of course the uncollectability or threatened uncollectability of an anticipated judgment does not constitute irreparable harm). In addition, because neither Mountain States, nor BC&D is a defendant in this action, and neither is a party upon which Castlerigg could execute in the event it obtains a judgment, it is beyond the scope of this litigation to consider how the Imperial transaction might impact Mountain States or BC&D's solvency.

26.     Attached hereto as Exhibit G is a true and correct copy of an unaudited consolidated financial statement for Apollo for the year ending December 2006 (the "Consolidated Statement"). This is the most updated and current financial statement for Apollo. The only material change to the numbers on this document from December 2006 to June 2007 is a reduction in its subsidiary Earth Biofuels' assets by $7 million – as a result of investment losses.

27.     A review of the consolidated statement clearly reveals that, including all of its subsidiaries and investments, Apollo has $145 million in assets, and $72 million in liabilities – for a total of $73 million in net assets. (Even if Apollo's assets were reduced commensurately with Earth Biofuels' drop in assets, it still has net assets of $65 million). As of December 2006, Apollo had $550,000 in cash, and was producing $47 million in revenue annually. Although

11

Apollo's cost of sales outstrips its revenues and is losing money, there is no threat that Apollo will cease its operations.

28. In terms of the proposed sale of assets, the Imperial Agreement contemplates the payment of $2.5 million in cash to the "Seller" – which is defined as Apollo, Mountain States and BC&D – collectively. Given Apollo's plans to close BC&D in the event that the Imperial deal closes, and the fact that Mountain States will be left with nothing but helium reserves, Apollo, Mountain States and BC&D intend to apply the cash payment to Apollo and the parties anticipate that Apollo will receive the registration rights in the Imperial stock. In addition, as Apollo is not saddled with any of the liabilities set forth at Exhibit B of the Imperial Agreement, and to be assumed by Imperial, Imperial's assumption of Mountain States and BC&D's liabilities will not materially impact Apollo's balance sheet.

29. But, even if the liabilities to be assumed by Imperial were ascribed to Apollo, they would still represent an infinitesimally small share of Apollo's assets and liabilities, and do not threaten to make Apollo insolvent. Even if the transfer of liabilities set forth in the Imperial Agreement – which Castlerigg values at $8.3 million – were deemed to be a "repayment" of debt and a transfer of assets, Apollo would still be left with $64.5 million in net assets (and $57.5 million in net assets if the $7 million loss to Earth Biofuels is included). As a matter of law Apollo's purported threatened insolvency cannot constitute irreparable harm and, therefore, cannot provide the basis for a pre-judgment restraint on Apollo or its subsidiary's assets. Nevertheless, regardless of how Castlerigg casts the transaction, Apollo is hardly at risk of becoming insolvent, and Castlerigg fails to provide any evidence that it will suffer irreparable harm, in the event that the Imperial deal is completed.

30. The impact of the Imperial deal upon Mountain States and BC&D is irrelevant. Castlerigg does not have a claim against either of those two entities, and has no basis for a claim on its note as against either Mountain States or BC&D. Castlerigg cannot obtain a money judgment as against Mountain States or BC&D, and further has no basis for attempting to execute upon a money judgment as against either company. Castlerigg's assertion that it will suffer irreparable harm if the Imperial transaction is completed is not only at odds with Apollo's financial status, but also the fact that Castlerigg has no right of recovery as against Mountain States and BC&D. Whatever impact the sale might have upon Mountain States or BC&D does not threaten Castlerigg with irreparable harm.

Accordingly, for all of the foregoing reasons, there is no basis for the Court to enter a preliminary injunction restricting Mountain States and BC&D's sale of assets to Imperial.

_____
Dennis McLaughlin

Sworn to before me this
___8___ day of August, 2007

_____
Notary Public

MARCELLA SMITH
MY COMMISSION EXPIRES
June 27, 2009